# EXHIBIT A

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV21951119 | D1 CM | 45146597 |

Rule 4 (B) Ohio

Rules of Civil Procedure

# SUMMONS

JERRY PETTRY **PLAINTIFF**
VS
GENERAL MOTORS LLC **DEFENDANT**

GENERAL MOTORS LLC
CO CORPORATION SERVICE COMPANY
50 WEST BROAD STREET
SUITE 1330

COLUMBUS OH 43215

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on:



**Plantiff's Attorney**

EDWARD S JERSE
1360 W. 9TH ST. SUITE 200

CLEVELAND, OH 44113-0000

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

Case has been assigned to Judge:

MICHAEL P SHAUGHNESSY
Do not contact judge. Judge's name is given for attorney's reference only.

NAILAH K. BYRD
Clerk of the Court of Common Pleas



By_____
Deputy

| DATE SENT |
|---|
| Aug 10, 2021 |

COMPLAINT FILED  08/09/2021

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| JERRY PETTRY<br>3487 Varmland Court<br>Brunswick, Ohio 44212<br><br>Plaintiff<br><br>v.<br><br>GENERAL MOTORS LLC<br>c/o Corporation Service Company<br>50 West Broad St., Suite 1330<br>Columbus, OH 43215<br><br>Defendant | Case No.<br><br>Judge<br><br>**COMPLAINT**<br>WITH JURY DEMAND |

Plaintiff Jerry Pettry, by and through undersigned Counsel, submits the following Complaint for damages against Defendants General Motors LLC and alleges as follows:

**JURISDICTIONAL ALLEGATIONS**

1. Plaintiff Jerry Pettry is a resident of the state of Ohio at the captioned address.

2. Defendant General Motors LLC ("GM") is a foreign limited liability company that is registered with the Ohio Secretary of State to do business in the state of Ohio. GM maintains a statutory agent at the captioned address.

3. For many years, GM has owned and operated a scrap metal business at its "General Motors Parma Metal Center," which is located at 5400 Chevrolet Boulevard in Parma, Ohio (the "Premises").

4. The incident which is the subject of this Complaint occurred on the Premises in Cuyahoga County on August 12, 2019.

5. Under Civil Rules 3(C)(3) and 3(C)(6), this Court is a proper venue for this action.

**GM WAS IN POSSESSION & CONTROL OF THE PREMISES**

6. At all relevant times, GM was in both possession and control of the Premises. GM's possession and control over the Premises was both physical and actual.

7. At all relevant times, GM had the legal right and/or contractual authority to admit or exclude people from the Premises.

8. At all relevant times, GM was the possessor or occupier of the Premises.

## PLAINTIFF WAS A BUSINESS INVITEE OR FREQUENTER

9. At all relevant times, Plaintiff Jerry Pettry was employed by non-party Stone Transport, LP ("Stone Transport") as a truck driver/loader.

10. As of August 12, 2019, GM had retained Stone Transport to load and haul scrap metal away from the Premises. Stone Transport assigned Pettry to work at the "baler building" on the Premises.

11. At all relevant times, Plaintiff was lawfully on the Premises.

12. At all relevant times, Plaintiff was on the Premises for the economic benefit of GM.

13. At all relevant times, Plaintiff was a "frequenter" of the Premises as that term is defined by the Ohio Revised Code.

## GM'S OPERATIONS ON THE PREMISES

14. The General Motors Parma Metal Center is a metal stamping facility and assembly plant which processes over 500 tons of steel per day.

15. As the press systems within the facility stamp the steel into automobile parts, the unused steel or "scrap metal" falls onto conveyor belts below the presses. Each conveyor belt continuously transports scrap metal to a main conveyor belt.

16. The main conveyor belt carries the scrap metal out of the stamping facility into a "baler building" on the Premises. (The term "baler building" is an anachronism but is still used to refer to a particular part of the facility.)

17. Inside the baler building, Stone Transport employees, such as Pettry, were assigned to guide the scrap metal into the trailers of trucks for eventual transport away from the facility.

18. Stone Transport kept multiple trailers at the Premises so the continuous flow of scrap metal could be directed into awaiting trailers and subsequently hauled away from the Premises by Stone Transport truck drivers.

19. Stone Transport typically kept at least two trucks with trailers at the Premises to accept the scrap metal being conveyed into the baler building.

20. During the scrap metal loading process, and as the trailer of one truck filled, Stone Transport workers, including Pettry, were frequently required to move the trucks and adjust the flow of the scrap metal to avoid having a trailer overflow and heavy scrap metal fall to the floor of the baler building. At all relevant times, drivers/loaders were required by the process to work with a high degree of urgency.

21. When the trailer of one truck would become filled, a loader would reposition the flow of scrap metal into an adjacent empty trailer, move the filled truck forward, bring a second truck and trailer forward into the former position of the first truck, divert the flow into the trailer of the second truck, and then move the first truck further away from the baler building.

22. At all relevant times, GM had sole control of the independent contractor Stone Transport employees' workplace, including that of Pettry.

## GM'S DUTY OF CARE

23. At all relevant times, GM owed business invitees and/or frequenters, including Pettry, a duty of ordinary care; a duty to maintain the Premises in a reasonably safe condition and in light of the operations there and the urgency thereof; a duty to warn invitees like Pettry of latent or concealed dangers or hazards; and a duty to reasonably respond to complaints of unsafe conditions that were exclusively within GM's control, such as the condition of the floor.

24. On and before August 12, 2019, the floor of the baler building on the Premises was in poor condition.

25. Prior to August 12, 2019, the scrap metal loading and hauling process, including years of heavy trucks and semi-tractor trailers repeatedly driving inside the baler building and being loaded with heavy scrap metal, had caused the floor of the baler building to deteriorate or had contributed to that deterioration.

26. On and before August 12, 2019, the floor of the baler building was riddled with defects, depressions, cracks, potholes, deteriorating asphalt and/or concrete, abandoned railroad

tracks, uneven surfaces, protruding metal grates, and remnant drainage ditches (collectively "defects.")

27. On and before August 12, 2019, there were trip hazards on the floor of the baler building.

28. Prior to August 12, 2019, Stone employees, including drivers and loaders, had tripped and/or been injured from tripping and/or falling on defects on the floor of the baler building.

29. Prior to August 12, 2019, GM, directly or through its employees and agents, had received complaints (formal or informal) related to defects in and/or the poor condition of the floor of the baler building.

30. Prior to August 12, 2019, GM employees and/or agents had inspected the floor of the baler building to identify defects, trip hazards, or dangerous conditions.

31. GM plant managers conducted a bi-annual "safety inspection" during which they toured the Premises, including the baler building. At least one member of the "safety committee" who performed this inspection was responsible for studying the condition of the floor.

32. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that the floor of the baler building was in poor condition and unsafe.

33. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that the floor of the baler building contained defects that could cause a person to trip and fall, including the broken concrete which caused Plaintiff to trip and fall.

34. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that the scrap metal loading and hauling process would require Stone Transport employees, including Plaintiff, to traverse the floor of the baler building.

35. On and before August 12, 2019, GM, directly or through its employees and/or agents, wanted and expected drivers/loaders, including Plaintiff, to work with a high degree of

urgency in the scrap metal loading and hauling process and to avoid having scrap metal overflow the trailers and fall on the baler building floor.

36. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that drivers/loaders, including Plaintiff, were required by the scrap metal loading and hauling process to work with a high degree of urgency and to avoid having scrap metal overflow the trailers and fall on the baler building floor.

37. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that the presence of large trucks and/or the scrap loading and hauling process could obstruct, obscure, conceal, divert attention from, or otherwise render one or more of the defects not reasonably observable to drivers/loaders, including Plaintiff, working in the baler building.

38. On and before August 12, 2019, GM, directly or through its employees and/or agents, knew or should have known that the scrap metal loading and hauling process created attendant circumstances, including but not limited to the urgency of that process, visual obstructions and/or distractions, and the deteriorated condition of the floor, which could divert the attention of drivers/loaders, including Plaintiff, away from observing or recognizing one or more of the defects in the baler building floor.

39. At all times relevant, it was reasonably foreseeable to GM, either directly or through its employees and/or agents, that its failure to repair, replace, and/or remove the defects in the floor of the baler building could cause one or more of the Stone Transport drivers or loaders to trip and sustain serious injuries. These defects included the broken concrete or defect which ultimately caused Plaintiff to trip, fall, and sustain injuries.

40. GM, directly or through one or more of its employees and/or agents, knew or should have known that the deteriorated floor in the baler building was not in a reasonably safe condition and it was foreseeable to GM that the deteriorated floor would cause injury to Plaintiff.

41. GM, directly or through one or more of its employees and/or agents, knew or should have known that the deteriorated floor in the baler building was not in compliance with industry standards, state or local building codes, and/or OSHA regulations.

42. GM, directly or through one or more of its employees and/or agents, knew or should have known that the deteriorated floor in the baler building was a known safety hazard and not in compliance with OSHA regulations.

43. GM, directly or through one or more of its employees and/or agents, failed to comply with OSHA standards, specifically those standards related to the maintenance and repair of walking-working surfaces, including but not limited to, regulations 1910.22(a) and (d)(1) – (d)(3) surface conditions and their inspection, maintenance, and repair.

## THE INCIDENT

44. On or about August 12, 2019, Plaintiff was working in the baler building on the Premises.

45. Plaintiff was loading trucks with scrap, driving them out of the baler building, and bringing a fresh truck into the building to continue the loading process.

46. At about 8:45 a.m. on the day of the incident, Plaintiff moved a loaded truck forward to the door of the baler building and then moved a second truck forward and into position to receive scrap metal.

47. As Plaintiff was walking back to the first truck that he had moved forward, Plaintiff stepped on broken concrete, turned his ankle, tripped, and fell hard to the ground.

48. Plaintiff fell on his right shoulder, scraped his elbow, and believes he also hit his right hip in the fall. He immediately felt that something was wrong with his right shoulder. He also felt pain in his ankle and right hip.

49. After the fall, Plaintiff, who is right-handed, tried to crank the "dolly leg" on a truck and knew instantly that something was not right with his shoulder.

50. At all relevant times, GM, directly or through its employees and/or agents, retained control over the area in which Plaintiff tripped and fell.

51. At all relevant times, the floor of the baler building, including the area of broken concrete on which Plaintiff tripped and fell, was a critical variable in Plaintiff's work.

52. By, at all times relevant, retaining control over the floor of the baler building, including the area of broken concrete on which Plaintiff tripped and fell, GM, directly or through its employees and/or agents, controlled a critical variable in plaintiff's work.

53. At all relevant times, GM, directly or through its employees or agents, retained control over the maintenance and repair of the floor in the baler building.

54. At all relevant times, GM failed to abate the hazard created by the broken concrete or defect.

55. At all relevant times, GM failed to reasonably repair or replace the broken concrete or defect.

56. At all relevant times, Plaintiff was paying reasonable attention.

57. Plaintiff was not negligent.

58. Plaintiff did not cause or contribute to causing the August 12, 2019 incident in which he tripped, fell, and sustained injury at the Premises.

59. No third party, other than GM or one or more of GM's employees or agents, was negligent relative to the incident in which Plaintiff was injured.

60. No third party, other than GM or one or more of GM's employees or agents, caused or contributed to the incident in which Plaintiff was injured on the Premises.

## CAUSE OF ACTION
## NEGLIGENCE

61. Plaintiff realleges, and incorporates by reference, each and every allegation in each and every paragraph of this Complaint as if fully rewritten herein.

62. GM owed a duty to all business invitees and/or frequenters, including Plaintiff, to take all reasonable steps necessary to render the work area in the baler building on the Premises safe.

63. GM owed a duty to all business invitees and/or frequenters, including Plaintiff, to keep the Premises in a reasonably safe condition.

64. GM, directly or through its employees and/or agents, knew or should have known that its failure to repair, remove, and/or replace the defects in the baler building floor, including the broken concrete which ultimately caused Plaintiff to trip and fall, could cause serious injury to the drivers/loaders, including Plaintiff, while engaged in the scrap metal loading and removal process or working in the baler building.

65. GM owed a duty to business invitees and/or frequenters, including Plaintiff, to warn them of latent defects or hazards.

66. GM, directly or through its employees and/or agents, failed to take all reasonable steps to render the work area in the baler building on the Premises safe.

67. GM, directly or through its employees and/or agents, failed to keep the Premises in a reasonably safe condition.

68. GM, directly or through its employees and/or agents, failed to take all reasonable steps to repair and/or replace defects in the baler building floor, including the broken concrete or defect which ultimately caused Plaintiff to trip and fall.

69. In breaching one or more of the duties it owed Plaintiff, GM was negligent.

70. In breaching one or more of the duties they owed Plaintiff, one or more of GM's employees and/or agents was negligent.

71. As a direct and proximate result of GM's negligence, and/or the negligence of one or more of its employees and/or agents, Plaintiff sustained injuries of a personal, pecuniary, and permanent nature, including but not limited to serious bodily injuries, scarring, disfigurement, pain and suffering, mental anguish, medical expenses now and into the future, personal property losses and expenses, lost wages, loss of earning capacity, loss of enjoyment of life, and other damages to be proven at the trial of this matter.

72. With reasonable certainty, Plaintiff will require future medical treatment and will incur additional economic damages, including future medical bills, for his physical injuries and/or

emotional distress directly and proximately caused by GM's negligence and/or the negligence of GM's employees and/or agents.

73. GM is vicariously liable for its employees' and/or agents' negligence which directly and proximately caused injury to Plaintiff.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Jerry Pettry prays for judgment against Defendant General Motors LLC in an amount in excess of $25,000 on his claims for compensatory damages. Plaintiff also seeks costs, pre- and post-judgment interest, attorney fees, and such other legal and equitable relief as is deemed appropriate from Defendant.

## JURY DEMAND

Plaintiff requests a trial by jury on all counts.

Respectfully submitted,

s/ Drew Legando
Drew Legando (0084209)
Edward S. Jerse (0013155)
**MERRIMAN LEGANDO WILLIAMS & KLANG, LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. drew@merrimanlegal.com
   edjerse@merrimanlegal.com

*Counsel for Plaintiff*

## INSTRUCTIONS FOR SERVICE

**TO THE CLERK:** PLEASE SERVE THE DEFENDANT VIA CERTIFIED MAIL AT THE ADDRESS SET FORTH IN THE CAPTION.

9